IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 19, 2006 Session

## HARVEY DALTON v. LINDA JANE FAASEN DALTON

Direct Appeal from the Chancery Court for Shelby County
No. CH-03-1026     Walter L. Evans, Chancellor

No. W2006-00118-COA-R3-CV - Filed December 28, 2006

This case involves a trial court's division of marital property following a divorce. The wife came into the marriage with substantial assets, but the husband had no assets and owed a large debt to the IRS. During the marriage, the wife was continuously employed, and the husband was often unemployed. After the wife found out that her husband had quit one of his jobs, he executed a quitclaim deed conveying his interest in their house to the wife. When they later divorced, the trial court appointed a special master to classify certain assets and debts as marital or separate property. The trial court affirmed the special master's report with modifications. Both parties now challenge the classification of certain assets and the court's division of the marital property. For the following reasons, we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Gail R. Sevier, Vicki J. Singh, Memphis, TN, for Appellant

Kathleen D. Norfleet, Steven R. Walker, Memphis, TN, for Appellee

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Harvey Ellis Dalton ("Husband" or "Appellant") and Linda Jane Faasen Dalton ("Wife" or "Appellee") were married in 1989. This was Husband's second marriage and Wife's third. At trial, Wife was 61 years old and Husband was 57. The parties have no children together. When they married, Wife was working at Graceland and had a net worth of about $580,000. Husband had no assets, had been through bankruptcy, and owed an $18,000 debt to the IRS.

The parties kept their earnings separate while they were married. Wife paid the bills, but Husband contributed when he was working steadily. Wife was continuously employed during the marriage and earning $95,000 per year at the time of trial. Husband had worked at various construction jobs. He testified that he had quit several jobs without having another job available, and he was sometimes unemployed for periods of up to eight months. During the marriage, his annual income ranged from $5,568[1] to $49,504. At the time of trial, he was earning approximately $50,000 per year.

The parties lived in four different homes during their marriage. Before they married, Wife had paid for the first home in full with her own separate funds. The parties moved into it together and were married two years later. The parties would make improvements to each home they lived in, sell it, and use the proceeds to buy another home. A mortgage was obtained if necessary to cover the balance, and it appears that the mortgage payments were auto-deducted from Wife's checking account.[2] For the improvements, Wife would generally purchase the materials and sometimes paid labor for workers, but other times Husband and Wife would work together on the projects themselves. Husband claims to have paid for some materials. Husband also did extensive work constructing the third house, but it was being built by his employer and Husband was the building supervisor for that particular jobsite.

The houses were titled in Wife's name alone with the exception of the third in the series of houses, which they built. This was the most expensive house purchased during the marriage, and it was initially titled in both their names. However, a month after closing, on October 12, 1999, Husband executed a quitclaim deed conveying his interest to Wife. Their testimony conflicted as to why this was done. Wife claimed that Husband had promised to stay employed if they built the house because it would be more expensive. She found out after closing that he had quit his job

---

[1] These figures are taken from Husband's earnings record according to his Social Security Statement. Regarding the $5,568 figure displayed for 1995, Husband admitted that he had not reported all of his income when he attempted to start a home service business that year. His next lowest annual income reported was $12,387 in 1989.

[2] Husband originally testified that he made the mortgage payments himself in cash. However, he later stated that the mortgage payments were auto-deducted from Wife's account. Subsequently, he again said that he gave Wife cash each week to pay toward mortgage payments. Wife testified that the mortgage payments were deducted directly from her account.

months before and hidden it from her. She then asked him to quitclaim his interest to her, which he did because "he knew that he had been irresponsible." At trial, Husband admitted that he had been unemployed for three to four months, he did not tell Wife he had quit his job, and when she found a COBRA notice in the mail, he had told her it was a mistake. Husband claimed that when Wife found out he was unemployed, she asked him to sign the quitclaim deed so that the property could be put into a trust to avoid creditors' claims. The "Linda Jane Dalton Revocable Living Trust" was established a year after the quitclaim was executed, on October 9, 2000, and Wife then transferred the home into the trust.[3] The trust terms addressed the possibility of the parties' divorce, and it provided that if the marriage was dissolved, Husband would cease to be a beneficiary. At one point, Husband testified that the trust had existed when he quitclaimed the property, and the parties reviewed the trust terms together at that time. He said he understood that if anything happened to Wife, he was designated as the beneficiary so it protected both of them. However, he also testified that he didn't look at the quitclaim deed, and he didn't even know it was a quitclaim deed when he signed it. He further stated that he never intended to transfer title of the property.

When the third house was sold and the proceeds used to buy their current residence, it was titled in Wife's name only. She executed a quitclaim deed conveying the property to the trust on March 27, 2002. Husband also executed the quitclaim deed conveying "all of his right, title and interest which he may have had in and to the subject property, by virtue of marriage to [Wife]."

On or around April 1, 2003, the parties separated and Husband moved out of the home. Husband filed a complaint for divorce on May 29, 2003, alleging irreconcilable differences. On June 11, 2004, the trial judge appointed Attorney Arnold V. Lindseth, Jr., to serve as Special Master and to classify certain assets as either separate or marital. The property included: the parties' current residence; three vehicles; fourteen checking, savings, and investment accounts; stock options; personal property; and various debts. The parties stipulated to the classification of some of these assets.

The Special Master's report was filed on April 28, 2005. Relevant to this appeal, he found that the parties' third residence had become Wife's separate property at the point when Husband executed the first quitclaim deed conveying the property to her. Consequently, the proceeds from the sale of the third home, $245,131, were considered Wife's separate property. The parties' current residence was bought outright on the same day that their third home was sold, apparently with those same funds. Regarding their current home, the Special Master concluded that the asset's value was mixed separate and marital property. He classified the amount purchased with the proceeds from the third house as Wife's separate property ($245,131). The difference in that amount and the estimated value of the home was considered marital ($253,600 value − $245,131 paid = $8,469

---

[3] At trial, Wife was questioned about her previous testimony at a deposition when she stated that she had created the trust "to avoid probate for [her] family members, to make it easier for them when [she] died." At the deposition, Wife had explained her understanding that if she died, the house would remain in the trust and would not be transferred to Husband because he had a tax lien, and she did not want the IRS getting the house.

marital property). The Special Master did not consider the second quitclaim deed because, in his opinion, the residence was already Wife's separate property.

The Special Master also classified a certain A.G. Edwards IRA Account ("#6182") as a mixed separate and marital asset. Wife had opened the account in 1981 with Peoples Bank, but it was later transferred to Dean Witter Reynolds and then A.G. Edwards. After the parties married, Wife had rolled her Graceland 401k into #6182, which was partially funded with marital property. Therefore, the Special Master concluded that 80% of the account was separate property and 20% was marital.

During the divorce proceedings, Wife paid a debt to the IRS in the amount of $4,292.67. The Special Master classified it as a marital debt and recommended that Husband reimburse Wife for one-half that amount.

Both parties filed objections to the Special Master's report. The matter was heard on July 11, 2005, and the judge asked both parties to submit proposed orders regarding the division of marital property. On August 18, 2005, the court entered an order approving and adopting the Special Master's report with certain modifications. The order confirmed the finding that the value of the parties' current residence was a mixed asset. The judge agreed that when Husband executed the quitclaim deed conveying all his interest in the property, the house became Wife's separate property. However, the appreciation in the home's value since the date of the last quitclaim deed, $27,100, was classified as marital property.

Regarding the A.G. Edwards IRA Account #6182, the trial judge also agreed that it consisted of both marital and separate property, but he disagreed with the Special Master's percentages.[4] The court found that the account was not inextricably commingled, and upon a further review of the evidence, it considered 89.5% of the funds to be Wife's separate property and 10.5% to be marital property. The court attached a summary of the evidence it used to reach those figures.

The order also confirmed the Special Master's finding that the IRS debt Wife had paid was a marital debt. The debt was owed on the parties' joint tax return in 2002, and Husband was ordered to reimburse Wife for one-half the amount she had paid.

The divorce trial was held on November 1 – 3, 2005, and the final decree of divorce was entered on November 30, 2005. In regard to the division of marital property, the judge noted that Husband's contribution to the creation of marital assets had been minimal, but that his employment income had helped pay for some of the parties' marital and household obligations. The marital property was divided two-thirds to Wife and one-third to Husband. Husband filed his notice of appeal to this Court on December 30, 2005.

---

[4] The account at issue, previously designated #6182, was also referred to as #3768. It appears that the account is now designated #3768, but we will continue to refer to it as #6182.

## II. ISSUES PRESENTED

Appellant has timely filed his notice of appeal and presents the following issues for review[5]:

1.    Whether the trial court erred in its classification of the parties' marital and separate property when the court approved the Special Master's finding that the marital residence was a mixed separate and marital asset in contravention of Tennessee law;
2.    Whether the trial court erred in classifying the parties' marital and separate property when the court approved the Special Master's finding that the A.G. Edwards IRA account #6182 was not inextricably commingled, or the court failed to conclude, alternatively, that at least all of the appreciation in the IRA was marital property.
3.    Whether the trial court erred in its division of the marital property in failing to appropriately consider the statutory factors in T.C.A. § 36-4-121(c), resulting in an inequitable division.

Additionally, Appellee presents the following issue for review:

4.    Whether the trial court erred in concluding that the appreciation in the value of the parties' residence was marital property; and
5.    Whether the trial court erred in its division of marital property and marital debt, by not finding that Wife is entitled to full ownership of all the assets and reimbursement for the full amount of Husband's IRS debt.

For the following reasons, we affirm the decision of the chancery court.

## III. STANDARD OF REVIEW

The trial court's order referring certain matters to the Special Master, the Special Master's report, and the trial court's order on the report affect our standard of review on appeal. *See Manis v. Manis*, 49 S.W.3d 295, 301 (Tenn. Ct. App. 2001); *Archer v. Archer*, 907 S.W.2d 412, 415 (Tenn. Ct. App. 1995). Generally, concurrent findings of fact by a special master and a trial court are conclusive and cannot be overturned on appeal. *Manis*, 49 S.W.3d at 301. However, a concurrent finding is not conclusive where it is upon an issue not properly referred to a special master, where it is based upon an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. *Id.*

On appeal, we review findings of the trial court which reject or modify a special master's findings under the general standard of Tenn. R. App. P. 13(d). *Parks v. Eslinger*, No. M1999-02027-COA-R3-CV, slip op. at 8 (Tenn. Ct. App. M.S. Feb. 4, 2003). Our review is *de*

---

[5] In addition, Appellant's Statement of the Issues questions "whether the trial court erred in granting Wife's oral request for a stay of execution pending this appeal." However, his brief presents no argument and cites to no authority relative to this issue. He admits in his reply brief that the issue is not now properly before this Court.

*novo* upon the record, with the trial court's findings of fact accompanied by a presumption of correctness unless the evidence preponderates otherwise. ***Id.***

## IV. DISCUSSION

### A. The House

On appeal, Appellant first asserts that the chancery court erred when it approved the Special Master's finding that the value of the parties' residence was a mixed separate and marital asset. He maintains that by executing the quitclaim deeds, he did not intend to make a gift of his interest in the property.[6] At trial, Husband admitted that Wife found out after closing that he had quit his job, and he had hidden his unemployment from her for several months. However, he denies that he intended to make a gift of the property when she found out. According to Husband, when Wife learned that he was no longer working, she told him she needed to set up a trust to protect herself from creditors. He testified that she brought papers home a few weeks later and explained that he needed to sign them to protect them from creditors. He claimed that he found out "later on" it was a quitclaim deed when she brought home the trust papers and wanted to review them together. Husband said that he did not even want to see the papers, but Wife highlighted the chapters anyway. Husband later stated that when he had executed the quitclaim deed, the trust was already in existence and he discussed its terms with Wife at that time. The quitclaim deed was dated October 12, 1999, and the trust agreement was dated October 9, 2000.

Regarding the second quitclaim deed, Husband testified that the day after Wife closed on their current house, she asked him to stop by an attorney's office to sign a paper. Again, he claimed that he "didn't even look at it . . . [s]ince it was the next day after closing . . . ." The record reveals that the deed to the house was executed on February 14, 2002, and the second quitclaim was dated March 27, 2002.

Wife's version of the story is slightly different. She claimed that before they began building their third house, they had a talk about him "being responsible for staying employed" because the house would be expensive. According to Wife, when she found out he had been unemployed since before they closed on the house, she simply asked him to sign the quitclaim deed conveying title to her, and he did it because he knew that he had been irresponsible.

"Property classification is a question of fact." ***Bilyeu v. Bilyeu***, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005) (citing *Mitts v. Mitts*, 39 S.W.3d 142, 144-45 (Tenn. Ct. App. 2000)). Therefore, we

---

[6] Wife argues that the houses were her separate property because each was acquired in exchange for the previous house, and the first house was her separate property. Husband contends that the houses had become marital property for various reasons. However, if we find that the quitclaim deeds conveyed away any interest Husband may have had in the property, we need not consider whether the houses had, in fact, become marital property or whether they remained the separate property of Wife.

must affirm if there is any material evidence to support the trial court's concurrence with the Special Master's classification. *Archer*, 907 S.W.2d at 415.

We agree with Husband's contention that the classification of property does not depend on the state of its record title, but on the conduct of the parties. *See Altman v. Altman*, 181 S.W.3d 676, 680-81 (Tenn. Ct. App. 2005). However, "gifts by one spouse to another of property that would otherwise be classified as marital property[7] are the separate property of the recipient spouse." *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). A conveyance of property between spouses creates a rebuttable presumption of a gift to the recipient spouse[8], although it is not conclusive on the issue. *Dotson v. Dotson*, No. E1999-00135-COA-R3-CV, 2000 WL 688576, at *2 (Tenn. Ct. App. E.S. May 30, 2000). To be valid, a gift requires "(1) an intention to make the gift on the part of the donor, (2) delivery of the gift, and (3) its acceptance by the donee." *Fugate v. Fugate*, No. E2004-00546-COA-R3-CV, slip op. at 4 (Tenn. Ct. App. E.S. Sept. 20, 2004).

The first quitclaim deed contained the following language:

> KNOW ALL PERSONS BY THESE PRESENTS that . . . HARVEY E. DALTON . . . does hereby bargain, sell, remise, release, quit claim, and convey unto LINDA J. DALTON . . . all of their right, title, and interest in and to the following described real estate . . . .

---

[7] We express no opinion as to whether the houses had become marital property when Husband executed the quitclaim deeds.

[8] In his brief, Husband insists that the trial court erred in failing to recognize the nature of Wife's *revocable* trust. He argues that, as settlor and trustee, Wife had complete and unfettered control of the assets and the mere fact that an asset was held in the name of Wife's revocable living trust should have no bearing on the classification of the asset as separate or marital. Although we agree that the state of the record title is not controlling, we still must consider the fact that Husband conveyed all his interest in the properties to Wife, and then to Wife's trust, in determining whether the houses thereby became her separate property. If we find that Husband made a gift to Wife's trust, we will treat it as a gift to Wife. Even though Husband was designated as a beneficiary, his interest was merely potential, rather than vested, so long as the trust remained revocable. *See Head v. Wachovia Bank of Georgia, N.A.*, 88 S.W.3d 180, 192 (Tenn. Ct. App. 2002). His interest under the trust could "evaporate in a moment at the whim of" Wife, *see id.*, and in fact, the trust terms provided that if their marriage was dissolved, Husband would cease to be a beneficiary.

The trust terms also contained a paragraph entitled "Transfers of Community Property to the Trustee," which provided that any community property transferred to the trust would retain its character as community property. Husband argued that the term "community property" covered property that both parties had an interest in, such as marital property. This assertion was contradicted by an affidavit of the attorney who drafted the trust agreement, who stated that "'community property' as used in Section 4.2 is intended to cover community property acquired in community property states and is not intended to mean 'marital property' as that term is used in common law states such as Tennessee." Husband briefly mentions the term on appeal and again insists that the trust document was misinterpreted. At trial, Husband presented no evidence that the term was intended to cover marital property other than his attorney's opinion as to what the term could mean. Also, he cites no authority in his brief to support his position. We agree with the trial court's implicit finding that the trust's provision for "community property" retaining its character did not apply to "marital property" under Tennessee law.

The second quitclaim deed, which conveyed their current residence from Wife to the trust, was also signed by Husband. It provides:

> Harvey Dalton, husband of Linda Jane Dalton, joins in the execution of this document for the purpose of conveying all of his right, title and interest which he may have in and to the subject property, by virtue of marriage to Linda Jane Dalton.

At the hearing on the Special Master's report, the Special Master explained that he considered the quitclaim deeds to have been gifts of Husband's property interests to Wife. He based his decision on the language of the quitclaim deed and expressed his belief that once a deed is recorded, one need not look beyond the conveyance itself to the parties' subjective intentions. The trial judge also noted the "clear and unambiguous" language of the deeds and commented that "the documents speak for themselves." Husband's attorney repeatedly emphasized that the court must find an intention on Husband's part to make a gift, and several cases were cited in support of her position. The trial judge assured her that he would review the cases she had mentioned before making his final decision.

The Eastern Section of this Court faced a similar situation in *Denton v. Denton*, 33 S.W.3d 229, 231-32 (Tenn. Ct. App. 2000), where a trial court found that it had no choice but to give effect to an unambiguous quitclaim deed between spouses. The Court noted that it was unnecessary to decide exactly what motivated the trial court to find a gift because the *facts* did not preponderate against a finding of a gift. *Id.* at 232. "We must affirm the trial court if it reached the correct result even if we disagree with the reasoning employed by the court to arrive at that result." *Id.* (citing Tenn. R. App. P. 36(a); *Kelly v. Kelly*, 679 S.W.2d 458, 460 (Tenn. Ct. App. 1984)).

In *Denton*, the wife had decided to take a medical leave of absence from her job, and then her husband informed her that he had "quit his job last week" to start building houses. 33 S.W.3d at 232. He executed a quitclaim deed conveying their house to Wife so that she "would never have to worry about not having a home, no matter what decisions he made . . . ." *Id.* Also, he had a small business at the time and was attempting to avoid its high risk of personal liability. *Id.* At their divorce trial, the husband insisted that he did not intend to make a gift of the property to his wife. *Id.* at 231. He admitted that he knew a deed transferred title to property, but he maintained that he executed it to give his wife security rather than to make a gift. *Id.* at 233. After considering the parties' testimony along with the language of the quitclaim deed and the entire record, the Court concluded that the evidence did not preponderate against a finding that the husband made a gift of his interest in the property to the wife. *Id.* The Court explained:

> If he wanted his wife to feel secure, and if he executed the deed to achieve this result, it logically follows that the way he was going to make her feel secure was to put the property in her name, so that, regardless of what happened in his new business venture, she would own the property outright. Thus, while, as a general proposition, we

> agree with the husband that a quit claim deed is not conclusive evidence of a gift in every case, we cannot say that the trial court erred in its finding of a gift in view of the totality of the facts of this case.

*Id.* The Court affirmed the trial court's finding that the entire value of the property as of the date of the transfer was Wife's separate property. *Id.*

In the present case, there is material evidence in the record to support a finding that Husband intended to convey his interest in the house to Wife as a gift. Husband admitted that he had quit working and had hidden that fact from Wife until after closing on the house. When she found out, Husband explained that Wife became concerned about creditors and discussed setting up a trust. Wife testified that when she learned he had quit his job despite their conversation about him staying employed, she simply requested that he execute a quitclaim deed, and he did. Husband's explanation for signing the quitclaim deeds was that he just did not read them. His testimony about the dates and circumstances surrounding the quitclaim deeds does not comport to the evidence in the record before us. For example, at one point, he claimed that the trust was in existence before he executed even the first quitclaim deed. He said he understood that after he signed the quitclaim, he was protected because he had been designated as the beneficiary of Wife's trust. From this testimony, it is apparent that Husband knew the property would no longer be titled in his name. Still, the record reveals that the first quitclaim deed was executed on October 12, 1999, and the trust was not created until October 9, 2000. Also, Husband explained that he didn't read the second quitclaim deed because he signed it on the day after Wife closed on the house. The record reveals that the deed to the house was executed on February 14, 2002, and the second quitclaim was dated March 27, 2002. Whether Husband simply signed the quitclaim at Wife's request, or if he signed the deed so that the property could be put into Wife's trust to avoid creditors' claims, we cannot say that the trial court erred in finding that the conveyance was a gift. When the parties' testimony is considered along with the clear and unequivocal language of the quitclaim deeds, we find sufficient evidence to support the findings of the Special Master and the trial court.

In his brief, Husband cites several cases in which property was classified as marital even though one spouse had quitclaimed the property to the other during the marriage. In *Altman* and *Fugate*, quitclaim deeds were executed along with marital dissolution agreements during the course of divorces. *Altman v. Altman*, 181 S.W.3d 676, 680-81 (Tenn. Ct. App. 2005); *Fugate v. Fugate*, No. E2004-00546-COA-R3-CV, slip op. at 4 (Tenn. Ct. App. E.S. Sept. 20, 2004). In both cases, one spouse had taken advantage of the other's vulnerable state, and the trial court refused to enforce the quitclaim deeds and marital dissolution agreements. *Altman*, 181 S.W.3d at 681; *Fugate*, slip op. at 4. Although both decisions were affirmed, we find the facts of the present case to be clearly distinguishable.

In other cases Husband mentions, one spouse had conveyed property to the other to avoid claims of potential creditors, but the property was still classified as marital property.[9] *See Turner v. Turner*, No. M1999-00482-COA-R3-CV, slip op. at 8 (Tenn. Ct. App. E.S. Sept. 28, 2000) (executed a deed to shield residence from threat of a lawsuit); *Dotson v. Dotson*, No. E1999-00135-COA-R3-CV, 2000 WL 688576, at *2 (Tenn. Ct. App. E.S. May 30, 2000) (deed executed to protect the property from potential creditors should a business fail); *Hand v. Hand*, No. 01A01-9607-CH-00325, slip op. at 3 (Tenn. Ct. App. W.S. Apr. 18, 1997) (husband executed quitclaim to wife between surgeries to avoid estate disputes if he died); *Abney v. Abney*, C.A. No. 181, 1991 WL 16255, at *3 (Tenn. Ct. App. E.S. Feb. 12, 1991) (deed for liability purposes after the husband obtained his pilot's license). However, in each case, the trial court had refused to recognize the quitclaim deed finding that the party did not intend to make a gift, and on appeal, its credibility determination was entitled to great weight. *See, e.g.*, *Dotson*, at *3. On an issue which hinges on witness credibility, we will not reverse the trial court unless, other than the oral testimony of the witnesses, there is clear, concrete and convincing evidence to the contrary in the record. *Id.* (citing *Tenn. Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)). In the case at bar, the trial court approved the Special Master's finding that Husband made a gift of the property by executing the quitclaim deed. This finding is also given great weight on appeal, and we find material evidence in the record to support such a finding. Therefore, we affirm the trial court's classification of the house as Wife's separate property from the time when Husband executed the most recent quitclaim deed.

Next, we must consider the appreciation in the home's value since the date of the last quitclaim deed. The Special Master had classified the difference in the purchase price paid with Wife's separate funds and the home's appraised value as marital property . (Vol.2, p.289). The trial judge agreed that a portion of the home's value should be classified as marital property, but he modified the Special Master's finding. The trial court concluded that when Husband executed the second quitclaim deed on March 27, 2002, while living in the house, he conveyed away any interest

---

[9] In two of these decisions, a dissenting judge criticized this line of cases as recognizing a "sort of" transfer between spouses. *Dotson*, at *5 (Swiney, J., concurring and dissenting); *Turner*, slip op. at 2 (Swiney, J., dissenting). The dissent explained:

> Husband's argument to the Trial Court, and to this Court, is that he should be permitted to "transfer" the Sugartree residence to Wife to protect it from a possible creditor, but in the event of a divorce treat this transfer as never having happened. It was Husband's intention that this transfer would protect the property from a possible creditor of Husband. This was the purpose of the deed. This transfer was communicated to the world in general, including Husband's possible creditor. Husband should not now be allowed to argue that the transfer to Wife was a sham and thereby given no effect. . . . I would hold that if either spouse purports to transfer property as a gift to the other spouse for the stated purpose of shielding the asset from current or potential creditors of the spouse, the transfer will be given full effect in any subsequent divorce between wife and husband. In short, I would hold that the courts of this State will not be used to facilitate a sham by treating such a transfer as a "sort of" transfer by holding it may be a transfer when a creditor of the spouse threatens but is not a transfer if a divorce threatens.

*Turner*, slip op. at 1-2 (Swiney, J., dissenting).

he may have had in the house. (Vol.3, p.368). However, the appreciation in the home's value since the date of the last quitclaim deed, $27,100,[10] would be classified as marital property. (Vol.3, p.449).

"Marital property" includes any increase in the value of separate property during the marriage *if* each party substantially contributed to its preservation and appreciation. Tenn. Code Ann. § 36-4-121(b)(1)(B) (2005). On appeal, Wife contends that the home's appreciation was due to inflation, and not to any contributions made by Husband. She points to the testimony of Husband's expert witness, who admitted that his appraisal was based on the natural appreciation of the property even if no improvements had been made. (Vol.6, p.121). The expert also stated that he had not physically been inside the property, and he had performed a "drive-by" appraisal. (Vol.6, p.107).

Husband lived at the residence for approximately 14 months after he executed the last quitclaim deed. At trial, the parties disputed the extent of the improvements Husband made to the house. Wife agreed that both of them had worked together to install shelving in the laundry room and closets. She agreed that Husband had installed a custom marble backsplash in the kitchen, but she explained that it was a Christmas gift from Husband. She acknowledged that he had lowered their kitchen breakfast bar countertop but insisted that she did not want it done. Wife also admitted that Husband had laborers install a roof over their patio, but she claimed that he paid them only in pizza and beer. Husband stated that he built a fence around their yard, and Wife claimed that she paid for the materials. She also explained that they both did some landscaping work and leveled their yard with a load of sand and rocks. Wife contends that Husband's actions do not constitute a substantial contribution to the home's appreciation and preservation.

Again, we find the parties' situation to be comparable to the one in *Denton*. 33 S.W.3d at 234. In that case, the wife had downplayed the husband's efforts in improving their property, but she admitted that he did fix some things. *Id.* The trial court attributed two-thirds of the appreciation of the parties' land to inflation, and the remainder to the efforts of the parties. *Id.* at 235. On appeal, the Court reversed the trial court's split classification of the appreciation. It noted that "[s]ubstantial contributions are ones which are real and significant." *Id.* at 236 (citing *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 623 (Tenn. Ct. App. 1989)). However, "[t]hey need not be monetarily commensurate with the appreciation in the property's value during the marriage." *Id.* The Court concluded that the husband's efforts had helped the property to maintain its value and increase in value over time. *Id.* at 235. Once that finding was made, it did not matter that inflationary factors also impacted the value of the property. *Id.* at 236-37. The entire increase in value since the date of the husband's quitclaim deed was considered marital property. *Id.* at 237.

---

[10] The parties stipulated that the home's value at the time of purchase equaled the purchase price, $262,900. They also stipulated that the home was valued at $290,000 at the time of trial. Husband's expert, a licensed real estate appraiser, had testified that the appraised value of the property was $290,000.

In the present case, both the Special Master and the trial court classified a portion of the home's current value as marital property, apparently concluding that Husband had substantially contributed to the home's appreciation and preservation. "Whether a spouse made substantial contributions to the preservation and appreciation of separate property is a question of fact." *Mitts v. Mitts*, 39 S.W.3d 142, 145 (Tenn. Ct. App. 2000) (citing *Sherrill v. Sherrill*, 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992)). We find that the evidence does not preponderate against the trial court's finding that Husband's efforts substantially contributed to the home's appreciation and preservation, and we affirm the classification of the home's appreciation as marital property.

### B.  The IRA – #6182

Husband also asserts that the Special Master and the trial court erred by finding that Wife's IRA #6182 was not inextricably commingled. The Special Master classified the IRA as 80% separate property and 20% marital property. The trial court confirmed the Special Master's finding that the funds were not inextricably commingled, but upon "a further review of the evidence," the court concluded that 89.5% of the account was Wife's separate property, and 10.5% was marital property.[11] The trial court concluded that Wife made only two contributions to the IRA during the marriage that included marital funds.

In 1981, Wife had opened the IRA with Peoples Bank & Trust with a $550 deposit. In 1985, the IRA was transferred to Dean Witter Reynolds. The parties married on September 30, 1989. In 1992, the IRA was transferred to A.G. Edwards Account #6182, and its balance at that time was approximately $40,000.

In 1993, Wife left her job at Graceland and rolled her 401k balance of $15,243.21 into #6182. A portion of her 401k had been earned during the marriage. Wife produced a "certificate of participation" from Graceland dated October 31, 1989, a month after their marriage, showing the balance at that time to have been $4,081.20. The trial court classified $11,162 of the rollover as marital funds. ($15,243 rollover – $4,081 separate = $11,162 marital).

In February 2002, Wife attempted to deposit money into a different Roth IRA, including $2500 of her marital earnings. When she learned that she could not contribute that amount because of tax purposes, she transferred that deposit into #6182. The trial court considered $2500 of this

---

[11] On appeal, Husband contends that this case is indistinguishable from *Eldridge v. Eldridge*, 137 S.W.3d 1 (Tenn. Ct. App. 2002). In that case, a trial court made no factual findings to support its rulings regarding the classification of accounts. *Id.* at 17. On appeal, this Court was unable to find any evidence in the record supporting the trial court's findings. *Id.* Accordingly, we determined the preponderance of the evidence from the record without a presumption of correctness afforded to the trial court's ruling. *Id.* In this case, the trial court modified the Special Master's conclusions upon its "further review of the evidence." Also, the trial judge attached a "summary of the evidence" to its order, specifically listing his classification of each deposit into #6182. Furthermore, we find substantial evidence in the record regarding the history of account #6182 which supports the trial court's findings. Therefore, we find this case to be distinguishable from *Eldridge* and we review the trial court's findings accompanied by a presumption of correctness. Tenn. R. App. P. 13(d).

deposit to have been marital property. All other deposits were classified as Wife's separate property.[12]

Wife's separate property would be considered marital property if it was inextricably mingled with marital property. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002). However, commingling does not occur if the separate property continues to be segregated or can be traced into its product. *Id.* In a retirement account, "if separate funds and the gains associated with them can be segregated from contributions made with marital funds and gains, that property is not inextricably commingled and does not become marital property." *Miller v. Miller*, No. W2003-00851-COA-R3-CV, slip op. at 5 (Tenn. Ct. App. W.S. June 14, 2004). In this case, Wife was able to segregate her separate property and its associated gains from the parties' marital property and its corresponding gains. She clearly matched the two marital deposits to certain stock purchases. Also, she accounted for the investments' activity and distinguished the earnings of the marital property. Therefore, we affirm the trial court's finding that #6182 was not inextricably commingled. *Cf. Eldridge v. Eldridge*, 137 S.W.3d 1, 17-18 (Tenn. Ct. App. 2002) (where spouse could not clearly match marital deposits with destinations, and he failed to account for growth attributable to marital property, account was inextricably commingled).

Alternatively, Husband argues that at least the appreciation in the IRA's value should be classified as marital because he substantially contributed to its preservation and appreciation during the marriage. He contends that he made direct contributions to the IRA because some deposits contained marital property. Also, he claims that he contributed indirectly to the IRA by earning income used to meet household expenses so that Wife could preserve the account.

In *Harrison v. Harrison*, 912 S.W.2d 124, 127 (Tenn. 1995), our Supreme Court emphasized that any increase in value of separate property during marriage does not automatically become marital property. The increase in value is marital property only when the other spouse has substantially contributed to its preservation and appreciation. *Id.* The Court later clarified that a contribution to the *marriage* is not the same as a contribution to the preservation and appreciation

_____

[12] Husband disputes the trial court's classification of a certain class of deposits as Wife's separate property. From 1993 to 1995, and in 1997, Wife contributed $2,000 per year from her A.G. Edwards Account #6174 into the IRA at issue, #6182. It appears that #6174 had contained investments Wife owned prior to the marriage. The deposits to #6182 totaled $8,000. The remaining balance of #6174 was transferred into another account, which the Special Master and the trial court classified as entirely Wife's separate property. They also classified the $8,000 in deposits from #6174 as Wife's separate property. However, a $10.59 dividend was later paid into #6174. The Special Master found no proof of the source of the dividend and found that the $10.59 was marital property. Husband now contends that because the $10.59 in #6174 was marital property, the entire account was classified as marital property, including the previous $8,000 contributed to the IRA at issue. We find Husband's argument to be without merit. In the Special Master's report, when classifying the other accounts he would specifically state "this account is Wife's separate property" or "this account is marital property." However, regarding #6174, he found that "this $10.59 is marital property." We do not consider his classification of the $10.59 to have been a classification of every dollar that was ever present in #6174. For example, in the preceding paragraph, he mentioned that some funds were transferred from #6174 to another account, and he still classified the destination account as entirely Wife's separate property. We find material evidence supporting the finding of the Special Master and the trial court that the $8,000 in deposits from #6174 were Wife's separate property.

-13-

of an asset. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 746 (Tenn. 2002). Although a spouse's contribution to the marriage is considered when making a determination of marital property, there must be some link between a spouse's marital efforts and the appreciation of separate property before the separate property's appreciation is considered marital property. ***Id.*** In this case, we find no such link between Husband's contributions to the marriage and Wife's IRA account #6182. Although two traceable deposits of marital property contributed to the IRA, both of them came from Wife's earnings. From our review of the record, it does not appear that Husband made any financial contributions to any of the investment accounts. His general contributions to the marriage are not a sufficient basis for finding that the appreciation of Wife's separate property thereby became marital.

Finally, Husband points out that the Special Master did not produce his "notes" at the hearing on the Special Master's report to show how he reached the various figures in his calculations. According to Husband, the trial court erred when it affirmed the Special Master's findings without reviewing the notes supporting his calculations. In support of his argument, Husband cites Tenn. R. Civ. P. 53.04, which provides that:

> The master shall prepare a report upon the matters submitted by the order of reference and, if required to make findings of fact and conclusions of law, the master shall set them forth in the report. The master shall file the report with the clerk of the court and, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits.

Unless the court's order of reference provides otherwise, it is error for the master to fail to file a transcript of the proceedings before him and of the evidence and exhibits he considered. ***Parks v. Eslinger***, No. M1999-02027-COA-R3-CV, slip op. at 6 (Tenn. Ct. App. M.S. Feb. 4, 2003) (citing *In re Estate of Tipps*, 907 S.W.2d 400, 403 (Tenn.1995)). However, the failure to produce this information is not always reversible error. ***Id.*** "The purpose of the requirement that the special master file a record of proceedings is so that the trial court can review any evidence taken before the master and make independent findings." ***Id.***

In the present case, the Special Master produced the exhibits that he had used in reaching his calculations. It appears that there were no proceedings held before the Special Master, and we find no reference to any evidence or facts that he considered which were not included in the trial court's record. It seems that the only documents he did not produce were his spreadsheets or "notes" setting out his calculations step-by-step. The trial court even instructed the attorneys to submit a consent letter to the Special Master requesting his spreadsheets and explained that if they still had questions after that then the Special Master could be called as a witness to clarify his conclusions. In his brief, Husband notes that "no such spreadsheet or worksheet was ever produced." However, he does not mention whether he ever sent the consent letter to the Special Master requesting the spreadsheets. In sum, we find that the Special Master's failure to produce his "notes" is not reversible error. The

trial court had sufficient evidence before it to make independent findings, as demonstrated by the court's decision to modify the Special Master's conclusions upon its "further review of the evidence." The trial court's findings with regard to the IRA #6182 are affirmed.

### C.    The IRS Debt

On appeal, Wife asserts that the trial court erred in only requiring Husband to reimburse her for half the amount of the IRS debt. Husband points out that the debt was not even in existence at the time of the final hearing, but he agrees that the court was within its discretion in requiring each party to pay half the debt. The debt was owed from the parties' joint federal income tax return from 2002. The parties separated in 2003. Wife apparently received a notice from the IRS about the debt in 2004. She claimed that the debt was due to Husband's failure to report all of his income on their 2002 return. Wife paid the total bill to avoid any further accrual of interest and penalties. The trial court approved the Special Master's finding that the debt was considered marital debt, and ordered Husband to reimburse Wife for half the amount of the debt.

"Marital debts" are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Unless a court has made provisions for the distribution of a couple's marital property in a decree of legal separation, a period of separation before divorce has no effect on the classification of debt as marital or separate. *Id.* at 813-814. Separated parties are still married, and although they live apart, the debts they incur during that time remain marital just as the property they acquire during that time is marital. *Id.* at 814. As such, the 2002 IRS debt incurred on the parties' joint tax return would have been considered marital debt. Tennessee courts should consider four factors when equitably distributing marital debt: (i) the debt's purpose; (ii) which party incurred the debt; (iii) which party benefitted from incurring the debt; and (iv) which party is best able to repay the debt. *Id.* In accordance with these factors, we cannot say that the trial court erred in assigning half the debt to each party.

### D.    The Overall Division of Property

Husband contends that the court's division of marital property was inequitable because he received only one-third of the marital property. Wife also claims that the trial court erred because she insists that Husband was entitled to none of the marital property. In their briefs, each party addresses the various factors set forth in Tenn. Code Ann. § 36-4-121(c) (2005), and explains how the factors weigh in his or her favor.

This Court's review of a trial court's marital property division is *de novo* upon the record, affording a presumption of correctness to the trial court's findings of fact. Tenn. R. App. P. 13(d); *Dellinger v. Dellinger*, 958 S.W.2d 778, 780 (Tenn. Ct. App. 1997) (citing *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Dalton v. Dalton*, 858 S.W.2d 324, 327 (Tenn. Ct. App. 1993)). Trial courts are given wide discretion by appellate courts in the manner in which marital property is divided, and, therefore, its division of marital property is given great weight on appeal. *Id.*, (citing

*Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994); *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987)). Dividing a marital estate is not a mechanical process; the goal is to fashion an equitable remedy by considering the factors set forth in Tenn. Code Ann. § 36-4-121(c). ***Kinard v. Kinard***, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). A division of marital property is not rendered inequitable merely because it is not precisely equal. ***Id.***, (citing *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988)). Neither does a property division become inequitable simply because each party does not receive a share or portion of each marital asset. ***Id.***, (citing *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994)).

The relevant statute provides that the trial court shall consider all relevant factors in equitably dividing the marital property, including:

> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
> (10) The amount of social security benefits available to each spouse; and
> (11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (2005). An equitable property division is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case. ***Tate v. Tate***, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003) (citing *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988)).

In discussing his final order, the trial judge said he had reached his findings "[a]fter hearing all the proof and evidence presented" by the parties. He noted his consideration of the fact that Husband's contribution to the creation of the assets had been minimal. However, he went on to recognize that Husband's employment income over the 13 years the parties were married had helped pay household obligations, and he said that Husband should receive some credit for the increase in value of Wife's separate property. He stated that Wife's income had been at least two times that of Husband's during the marriage and concluded that the division of the assets should be two-thirds to Wife and one-third to Husband. We do not consider the court's division of property inequitable. The court had a voluminous record of exhibits and testimony before it on which to base its decision. Even though the trial court did not specifically address each statutory factor in its final order, we believe the court considered the factors and weighed the most relevant ones in making its decision. Depending on the unique facts of a case, some factors may be significant and others' importance may be diminished. *See Cronin-Wright v. Wright*, 121 S.W.3d 673, 675 (Tenn. Ct. App. 2003). In this case, we do not find error in the trial court's emphasis of certain factors, such as "the contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property" and "the estate of each party at the time of the marriage." Tenn. Code Ann. § 36-4-121(c)(5),(7) (2005). These factors were proper for consideration and were particularly relevant in light of the facts of this case. Therefore, we affirm the trial court's distribution of marital property.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellant, Harvey Dalton, and his surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, JUDGE

-17-